UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X
                                         :
COUNTY OF WESTCHESTER,                    :            OPINION
Plaintiff,                                :          AND ORDER
                                         :
                    -v-                   :    13cv2741 (DLC)
                                         :
UNITED STATES DEPARTMENT OF HOUSING AND   :
URBAN DEVELOPMENT ("HUD"), and SHAUN      :
L.S. DONOVAN, AS SECRETARY OF HUD,        :
Defendants.                               :
                                         :
---------------------------------------- X
                                         :
                                         :
COUNTY OF WESTCHESTER,                    :
                                         :
Plaintiff,                                :    15cv1992 (DLC)
                                         :
                    -v-                   :
                                         :
UNITED STATES DEPARTMENT OF HOUSING AND   :
URBAN DEVELOPMENT ("HUD"), and JULIAN     :
CASTRO, AS SECRETARY OF HUD,              :
                                         :
Defendants.                               :
                                         :
---------------------------------------- X

APPEARANCES:

For Plaintiff:

Robert F. Meehan
Westchester County Attorney's Office
148 Martine Avenue, 6th Floor
White Plains, NY 10601

For Defendants:

Preet Bharara
David J. Kennedy
Lara K. Eshkenazi
Benjamin H. Torrance
United State Attorney's Office, Southern District of New York
86 Chambers Street, 3d Floor
New York, NY 10007

DENISE COTE, District Judge:

Plaintiff County of Westchester ("County") brings these two actions, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), 42 U.S.C. §§ 12705(c)(1) and 12711, and the Fifth Amendment of the U.S. Constitution, against defendants the United States Department of Housing and Urban Development("HUD") and HUD Secretary Julian Castro ("Secretary"), seeking review of final administrative determinations by HUD to withhold from the County funds from Community Planning and Development Formula Grant Programs  ("CPD Funds") for the 2011, 2013, and 2014 fiscal years ("FY2011," "FY2013," and "FY2014").[1]  For the following reasons, these actions are dismissed and judgment is entered in favor of the defendants.

---

[1]  The County's first lawsuit, <u>Westchester v. U.S. Dep't of Hous. & Urban Dev.</u>, 13cv2741 (DLC), addresses only the FY2011 CPD Funds.  <u>Westchester v. U.S. Dep't of Hous. & Urban Dev.</u>, 15cv1992 (DLC), addresses FY2011, FY2013, and FY2014 CPD Funds. FY2012 CPD Funds, which were once available to the County, have already been reallocated to other jurisdictions.

HUD withheld the CPD Funds at issue here because, in HUD's view, the County failed to provide an accurate certification that the funds would be administered in conformity with the Fair Housing Act and to affirmatively further fair housing ("AFFH"), as required by federal law ("Certifications").  To AFFH, the County was required to produce an "AI," which must include an analysis of impediments to fair housing choice in addition to offering appropriate actions to overcome the effects of any identified impediments.  HUD determined that the AIs which the County produced to obtain the CPD Funds at issue here were not acceptable under the standards mandated by the federal statutes and regulations that govern the grant programs:  despite HUD's assistance, encouragement and guidance, the County refused to provide an adequate assessment of the impediments which local zoning ordinances presented to fair housing choice within the County, and to adequately identify the actions it would take to overcome the effects of any such impediments.  The defendants have moved for summary judgment on the ground that their denial of the CPD Funds was not arbitrary and capricious or otherwise in violation of HUD's grant of statutory authority.  For the reasons, described below, that motion is granted.

Plaintiff has cross-moved for summary judgment on the ground that HUD may not consider local zoning ordinances when making a decision whether to grant or deny CPD Funds.  For this

proposition it relies on two statutory provisions under the HOME
Investment Partnerships Program ("HOME"), which is one of the
three CPD grant programs at issue here.  42 U.S.C. §§
12705(c)(1), 12711.[2]  These two provisions only apply to the HOME
program, and in any event do not relieve the County of its
obligation to make accurate Certifications and to produce
adequate AIs in order to obtain CPD Funds.

The defendants have an alternative ground for summary
judgment premised on the County's breach of its 2009 settlement
agreement with HUD, which concluded False Claims Act litigation
against the County.  In the course of that earlier litigation,
this Court determined that the County had filed seven false
Certifications between 2000 and 2006 that it would affirmatively
further fair housing.  Despite the requirements of federal law,
the County's AIs, submitted in connection with those
Certifications, did not analyze race-based impediments to fair
housing.  Instead, the Certifications restricted their analysis
to impediments to affordable housing in the County.  668 F.
Supp. 2d at 562.  In settling that litigation -- in which the
County stood to have damages assessed against it of over $150

---

[2] While the plaintiff's complaints also bring claims under the
Due Process and Equal Protection Clauses of the Fifth Amendment,
the plaintiff has not moved for summary judgment on those
grounds or relied on them in opposition to the defendants'
motion.  They are therefore considered abandoned.

million -- the County committed to providing an AI by December 2009 that was acceptable to HUD.  It did not do so.  It has provided HUD with essentially three AIs since 2009 -- one in 2010, one in 2011 and a third in 2013 -- and HUD has found all three to be inadequate.  This Opinion does not reach the question of whether HUD can withhold CPD funds for the County's breach of the settlement agreement.

Before turning to the factual background and then the legal analysis of the issues presented by these motions, it is important to note HUD's contention that there is particular urgency surrounding this litigation.  The congressional appropriation reserved for the FY2013 CPD Funds will, by law, revert to the U.S. Treasury on September 30, 2015.[3]  Before that time, the funds may be reallocated to other communities.  According to HUD, without expeditious resolution of the issues here, over $5 million in FY2013 CPD Funds will not be available for use anywhere as Congress intended.

**BACKGROUND**

The facts and procedural history giving rise to this dispute have been described in several previous Opinions issued by this Court and the Second Circuit Court of Appeals.  See,

---

[3] While the funds will remain available to the County for five years should it qualify for them, there is little likelihood of that happening.  The County has withdrawn from consideration for future CPD Funds in FY2015-2017.

e.g., United States ex rel. Anti-Discrimination Ctr. of Metro
N.Y., Inc. v. Westchester Cnty., 495 F. Supp. 2d 375 (S.D.N.Y.
2007) ("2007 Opinion") (denying motion to dismiss False Claims
Act lawsuit against the County); United States ex rel. Anti-
Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.,
668 F. Supp. 2d 548 (S.D.N.Y. 2009) ("2009 Opinion") (finding
that County's Certifications to obtain CPD Funds were false but
reserving on County's scienter); U.S. ex rel. Anti-
Discrimination Ctr. of Metro New York, Inc. v. Westchester
Cnty., N.Y., No. 06cv2860 (GWG), 2012 WL 917367 (S.D.N.Y. Mar.
16, 2012) (accepting in part and rejecting in part Monitor's
2011 Report) ("Magistrate Judge Opinion"); U.S. ex rel. Anti-
Discrimination Ctr. of Metro New York, Inc. v. Westchester
Cnty., N.Y., No. 06cv2860 (DLC), 2012 WL 1574819 (S.D.N.Y. May
3, 2012) ("2012 Opinion") (adopting Monitor's conclusions in
part and MJ's opinions in part); United States ex rel. Anti-
Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.,
712 F.3d 761 (2d Cir. 2013) ("Appeal Opinion") (affirming
holding that the County had breached promotion requirement);
Cnty. of Westchester v. U.S. Dep't of Hous. & Urban Dev., No.
13cv2741 (DLC), 2013 WL 4400843 (S.D.N.Y. Aug. 14, 2013) ("2013
Opinion") (dismissing APA claims for lack of jurisdiction and
statutory claim for pleading deficiency); Westchester v. U.S.
Dep't of Hous. & Urban Dev., 778 F.3d 412 (2d Cir. 2015) ("2015

Opinion") (vacating in part <u>2013 Opinion</u> and remanding on issue

of jurisdiction).  The Court assumes familiarity with those

Opinions.  Only those facts necessary to the resolution of the

present motion are described below.

## I. Statutory & Regulatory Framework

The CPD Funds at issue are allocated pursuant to three

different federal programs: the HOME program, the Community

Development Block Grant ("CDBG") program, and the Emergency

Solutions Grant ("ESG") program.  All three were enacted against

the backdrop of the Fair Housing Act ("FHA"), whose provisions

are incorporated by reference into the three grant programs'

authorizing statutes.

### A. Fair Housing Act

The FHA was passed in 1968 to provide "for fair housing"

within the limits imposed by the Constitution.  42 U.S.C. §

3601.  The statute bans discrimination on the basis of "race,

color, religion, sex, familial status, or national origin" in

connection with the sale and rental of housing and other private

real estate transactions, subject to limitations imposed by the

statute.  42 U.S.C. §§ 3604, 3605.  "The FHA was enacted to

eradicate discriminatory [housing] practices . . . includ[ing]

zoning laws and other housing restrictions that function

unfairly to exclude minorities from certain neighborhoods

without any sufficient justification."  <u>Texas Dep't of Hous. &</u>

Cmty. Affairs v. Inclusive Communities Project, Inc., --- S. Ct. ---, 2015 WL 2473449, at *13 (U.S. June 25, 2015) (citation omitted).

**B. Grant Programs**

The three grant programs all require that jurisdictions make certain submissions to HUD to determine eligibility.  Each program and its application process is described below.  Of principal relevance here are the requirement that applicants certify to HUD that they will "affirmatively further fair housing," including an "analysis of impediments"; for HOME grants, the requirement that jurisdictions submit a "housing strategy"; and, under the "consolidated plan" process established by regulation, the requirement that jurisdictions submit an "action plan."

**1. CDBG Program & the "Affirmatively Further Fair Housing" Requirement**

The CDBG program was established under the Housing and Development Act of 1974.  42 U.S.C. §§ 5301-5321 ("CDBG statute").  "The primary objective" of the program is "providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income."  Id. § 5301(c).  The CDBG program works against the backdrop of the FHA and incorporates by reference standards applicable to fair housing.

8

Jurisdictions applying for CDBG grants must certify that
they have satisfied six criteria in order to be eligible.  42
U.S.C. § 5304(b).  Applicants must certify, <u>inter alia</u>, that
"the grant will be conducted and administered in conformity with
the Civil Rights Act of 1964 [42 U.S.C, § 2000a <u>et seq.</u>][4] and the
Fair Housing Act [42 U.S.C. § 3601 <u>et seq.</u>], and the grantee
will affirmatively further fair housing."  <u>Id.</u> § 5304(b)(2).  By
HUD regulation, the duty to affirmatively further fair housing
requires the grantee to "conduct an <u>analysis to identify
impediments</u> to fair housing choice within the jurisdiction, <u>take
appropriate actions to overcome the effects of any impediments</u>
identified through that analysis, and maintain records
reflecting the analysis and actions in this regard."  24 C.F.R.
§ 570.601(a)(2) (emphasis added).

### 2. ESG Program

The ESG program was initially authorized as the "Emergency
Shelter Grants" program by the Stewart B. McKinney Homeless
Veterans Act of 1987; it was modified to its current form, and
name, by the Homeless Emergency Assistance and Rapid Transition
to Housing (HEARTH) Act of 2009.  Administered pursuant to 42
U.S.C. §§ 11371-11378, the purpose of the program is, among

---

[4] Title II of the Civil Rights Act of 1964 promotes equal access
in public accommodation.

other things, "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." Id. § 11301.

The ESG program does not have any independent certification requirements. A grantee may only receive an ESG grant, however, if it also receives a CDBG allocation. Id. § 11373(a). Functionally, therefore, eligibility for ESG hinges on proper AFFH certification pursuant to 42 U.S.C. § 5304(b)(2).

### 3. HOME Program & the Housing Strategy

The final grant program at issue concerns HOME funds, allocated under the Cranston-Gonzalez National Affordable Housing Act of 1990, codified at 42 U.S.C. §§ 12701-12714, 12741-12756. The statute states that its objective is to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis." Id. § 12702(3). As with the CDBG program, the HOME program is concerned with affordable housing, but operates in conformity with the FHA and incorporates standards relevant to fair housing.

In order to qualify for HOME funds, a jurisdiction must "submit to [HUD] a comprehensive housing affordability strategy in accordance with [42 U.S.C. § 12705]." Id. § 12746(5). Section 12705(b) sets out twenty criteria to be included in the

10

housing affordability strategy ("Housing Strategy"), two of
which are relevant for this Opinion.  Section 12705(b)(4)
requires grantees to

> explain whether the cost of housing or the incentives
> to develop, maintain, or improve affordable housing in
> the jurisdiction are affected by public policies,
> particularly by policies of the jurisdiction,
> including tax policies affecting land and other
> property, land use controls, zoning ordinances,
> building codes, fees and charges, growth limits, and
> policies that affect the return on residential
> investment, and describe the jurisdiction's strategy
> to remove or ameliorate negative effects, if any, of
> such policies . . . .

Id.  Another of the twenty criteria, like the CDBG statute,
requires grantees to certify "that the jurisdiction will
affirmatively further fair housing."  Id. § 12705(b)(15).

The definition of AFFH under the HOME statute is identical
to that under the CDBG statute.  24 C.F.R. § 91.225(a)(1).  The
AFFH certification is submitted as a component of the Housing
Strategy.  See id. §§ 91.200, 91.225.  "Certification," in turn,
is defined as a "written assertion, based on supporting
evidence," that will be deemed accurate "unless the Secretary
determines otherwise after inspecting the evidence and providing
due notice and opportunity for comment."  42 U.S.C. § 12704(21).
HOME grantees must also submit "annual updates of the housing
strategy," and the statutory scheme appears to treat these
annual updates as extensions of the initial Housing Strategy,
subject to ongoing approval or disapproval by the Secretary of

HUD.  42 U.S.C. § 12705(a)(2), (3).  Grantees thus must re-
certify each year that they are fulfilling the AFFH duty.

Section 12705(c)(1) governs HUD's approval or rejection of
Housing Strategies.  It provides:

> Not later than 60 days after receipt by the Secretary,
> the housing strategy shall be approved unless the
> Secretary determines before that date that (A) the
> housing strategy is inconsistent with the purposes of
> this Act, or (B) the information described in
> subsection (b) of this section has not been provided
> in a substantially complete manner.  For the purpose
> of the preceding sentence, the adoption or
> continuation of a public policy identified pursuant to
> subsection (b)(4) of this section shall not be a basis
> for the Secretary's disapproval of a housing strategy.

(Emphasis added.)

Finally, § 12711, which also appears in the same subchapter
of the U.S. Code, sets further limitations on HUD's ability to
approve or reject a jurisdiction's application for grant
funding.  It provides:

> Notwithstanding any other provision of this subchapter
> or subchapter II of this chapter, the Secretary shall
> not establish any criteria for allocating or denying
> funds made available under programs administered by
> the Secretary based on the adoption, continuation, or
> discontinuation by a jurisdiction of any public
> policy, regulation, or law that is (1) adopted,
> continued, or discontinued in accordance with the
> jurisdiction's duly established authority, and (2) not
> in violation of any Federal law.

Id. § 12711.

### 4. Action Plans

By federal regulation, jurisdictions may streamline their grant program submissions with a "consolidated plan," by which they may apply simultaneously for CDBG, ESG, and HOME funding, as well as other funding programs ("Consolidated Plan").  24 C.F.R. § 91.1.  Certain components of the plan -- including a Housing Strategy -- may be submitted on a five-year basis, as may the applicant's AI; other components must be submitted annually.  Id. § 91.15(b).  Among the required annual submissions are "action plans."  Action plans -- like those submitted to HUD by the County -- include a jurisdiction's application for funding, any update to its Housing Strategy, and its annual express certifications that it will AFFH.  Id. §§ 91.220, .225; see 2009 Opinion, 668 F. Supp. 2d at 553. Jurisdictions participating in a consortium that files a consolidated plan must abide by the same requirements.  See id. §§ 91.440, .445.  HUD is permitted to reject any "plan for which a certification is rejected by HUD as inaccurate, after HUD has inspected the evidence and provided due notice and opportunity to the jurisdiction for comment."  24 C.F.R. § 91.500.

### C. The Statutory Lapse Date

The CPD funds are allocated to jurisdictions based on a statutory formula.  If not disbursed to the earmarked jurisdiction, these funds may be reallocated to other

jurisdictions until the statutory lapse date, i.e. the date on which the federal appropriation for HUD funding expires.

Once the statutory lapse date passes, funds that have not been reallocated remain available to the original jurisdiction in an expired account for five fiscal years to satisfy obligations incurred prior to the lapse date.  31 U.S.C. § 1552(a); see 2015 Opinion, 778 F.3d at 417 n.8.  This means that, following the statutory lapse date, funds that were statutorily allocated to the applicant and not reallocated to other jurisdictions can only be distributed to the applicant. 31 U.S.C. § 1553(a); 2015 Opinion, 778 F.3d at 417 n.8.  They revert to the Treasury upon the expiration of the five-year deadline.  31 U.S.C. § 1552(b).

## II. The 2006 False Claims Act Litigation and 2009 Settlement

This litigation has its genesis in False Claims Act litigation filed against the County in 2006.  After this Court determined that the County had falsely certified to HUD that it was affirmatively furthering fair housing, the County entered into a settlement ("Settlement") with HUD in 2009.  Between that time and today, HUD and the County have sparred over the extent of the County's compliance with federal law and the Settlement, and the County's entitlement to federal housing and community development funds.  After the False Claims Act litigation and Settlement are described, the Opinion will describe the

principal milestones in the County's interaction with HUD in the years since the County settled the False Claims Act litigation.

### A. False Claims Act Lawsuit

In 2006, the Anti-Discrimination Center of Metro New York, Inc., acting as a <u>qui tam</u> relator, sued the County for violation of the False Claims Act, 31 U.S.C. 3729 <u>et seq.</u> ("FCA").  The lawsuit asserted that the County had received over $52 million from the federal government for housing and community development after falsely certifying, from 2000 through 2006, that it was affirmatively furthering fair housing.  The County had submitted those Certifications to HUD on behalf of itself and a consortium of all but five of the municipal entities in Westchester County.[5]  The County submitted Consolidated Plans every five years, including a Housing Strategy and an AI.  It submitted annual Action Plans in which it annually certified that it would AFFH.

In rejecting the County's motion to dismiss the FCA lawsuit, the Court held that a grantee that certifies to the federal government that it will AFFH as a condition to its receipt of federal funds must analyze the existence and impact of race discrimination on housing opportunities and choice in

---

[5] The municipalities of Mount Pleasant, Mount Vernon, New Rochelle, White Plains, and Yonkers do not belong to the Consortium.

its jurisdiction.  2007 Opinion, 495 F. Supp. 2d at 376.
Following the close of discovery, the plaintiff in the FCA
lawsuit brought a motion for partial summary judgment,
contending that there was no genuine issue that the County
knowingly submitted seven false annual Certifications that it
would AFFH.  According to the qui tam relator, the
Certifications were false because the County had failed to
analyze impediments to fair housing choice within the County in
terms of race.  In opposing the motion, the County continued to
dispute that it was required to analyze race when analyzing
impediments to fair housing choice, but also took the position
that it had determined that racial segregation and
discrimination were not significant barriers to fair housing
choice within the County.  2009 Opinion, 668 F. Supp. 2d at 551.
Accordingly, when it disbursed HUD funds, the County had not
deemed any municipalities within the Consortium to have failed
to AFFH, nor had it deemed any municipalities to be impeding the
County's ability to do so.[6]  Id. at 559.

---

[6] The Cooperation Agreement between the County and municipalities
participating in the Consortium provided that "the County is
prohibited from expending [CDBG] funds for activities in or in
support of any local government that does not affirmatively
further fair housing within its jurisdiction or that impedes the
County's action to comply with its fair housing certifications."

In the 2009 Opinion, this Court ruled that the County's certifications to HUD were false as a matter of law.  Id. at 562.  The Opinion found that the 2000 and 2004 AIs submitted by the County to HUD were devoted entirely to the lack of affordable housing in the County and related obstacles.  The record contained "no evidence that either of the County's AIs during the false claims period analyzed race-based impediments to fair housing."  Id.  The Opinion observed that while

federal law does not require the County to find evidence of racial discrimination or segregation where none exists, federal law does require that to obtain the HUD funds at issue . . ., the County had to maintain records of its analysis of whether race created an impediment to fair housing."  Id. at 563.  Because the County never performed the required analysis of race-based impediments to fair housing, it of course "never created a contemporaneous record of how its management of the HUD-acquired funds or any other 'appropriate' steps it could take would overcome the effect" of any impediments that did exist.  Id. at 565.  The Opinion observed that the

> statutory and regulatory framework . . . impose[d] no
> duty on the County to undertake any particular course
> of action to overcome an impediment to fair housing .
> . ., [but did] require the recipient of the federal
> funds to certify that it will take "appropriate"
> actions to overcome the effect of the impediments to
> fair housing choice that its analysis has identified.

Id.

While the 2009 Opinion found that the County's
Certifications were false, it denied summary judgment on the
issue of the County's "knowing" submission of false claims.  Id.
at 567.  Before the issue of the County's scienter could be
tried, the United States filed a notice of intervention in the
lawsuit and its own complaint against the County to recover
under the FCA the damages it had sustained, as well as
associated penalties due to the County knowingly presenting
false claims to obtain federal funding for housing and community
development.  Simultaneously, on August 10, 2009, the United
States and the County entered into a thirty-eight page
Stipulation and Order of Settlement and Dismissal
("Settlement").  Because of the treble damages provision of the
FCA, had the County not settled the litigation, it was at risk
of being found liable for over $150 million in damages.

**B. Settlement of FCA Litigation**

The Settlement acknowledged that the County receives
federal funding from the CDBG, ESG and HOME programs, among
others.  It required the County to pay $8.4 million to the
federal government and $2.5 million to the relator.  In
addition, the County was required to pay $21.6 million into the
County's account with HUD.  The Settlement provided that

> HUD shall make those funds available to the County for
> the development of new affordable housing units that
> will AFFH in the County, provided that the County's

18

> use and expenditure of the funds, and any program
> income earned from the use of the funds, as defined by
> 24 C.F.R. § 570.500(a), shall be subject to the
> requirements of the CDBG program

and other terms and conditions of the Settlement.  Those other
terms included the County's duty to ensure the development of at
least 750 new affordable housing units within seven years of the
Settlement.  The Settlement described the criteria, including
race-related criteria, for the placement of the new housing
units.  In addition, the County was required to add $30 million
in County funds to this development effort.  It also agreed that
"[i]n the event that a municipality does not take actions needed
to promote" or "undertakes actions that hinder" development of
the 750 housing units, it would "use all available means as
appropriate to address such action or inaction, including, but
not limited to, taking legal action."

Another significant component of the Settlement was the
appointment of a Monitor "for so long as the County's
obligations" under the Settlement "remain unsatisfied."  James
E. Johnson of Debevoise & Plimpton LLP has been serving as the
Monitor since August 2009.  The Settlement provided that the
Monitor would conduct compliance assessments every two years "to
determine whether the County has taken all possible actions
under" the Settlement, "including, but not limited to . . ., if
necessary, taking legal action."

The Settlement included several other important components. Of particular interest to the current litigation are the following.  The County explicitly acknowledged the importance of the obligation to AFFH, and committed to adopting a policy statement to that effect.  It also promised to complete within 120 days an "AI within its jurisdiction that complies with the guidance in HUD's Fair Housing Planning Guide . . . .  The AI must be deemed acceptable by HUD."  (Emphasis added.)  Besides identifying and analyzing the "impediments to fair housing within its jurisdiction, including impediments based on race or municipal resistance to the development of affordable housing," the County agreed that its AI would identify and analyze "the appropriate actions the County will take to address and overcome the effects of those impediments."  In this respect, the Settlement closely tracks the language of HUD's regulations defining the AFFH duty.  See, e.g., 24 C.F.R. § 91.225(a)(1).

The County made several other critical commitments in the Settlement, one of which became the subject of litigation in the ensuing years.  The County agreed that it would "promote, through the County Executive, legislation currently before the Board of Legislators to ban 'source-of-income' discrimination in housing."

**III. The County's AIs and HUD's Rejections: 2009 to 2013**

The County has never provided an AI to HUD that HUD deemed acceptable, despite its explicit commitment in the Settlement to do so.  Since the Settlement, HUD has withheld funds from the County and in some instances reallocated funds initially earmarked for the County to other jurisdictions.  The description of the ensuing years of application and rejection is organized around the AIs the County has submitted to HUD.  The final AI and its two supplements, submitted to HUD in 2013, preceded the two HUD letters that are the principal focus of the County's summary judgment motion:  the letters of August 9, 2013 and July 18, 2014.

**A. 2010**

In 2010, the County submitted a late and incomplete AI. Pursuant to the schedule set forth in the Settlement, the County's Settlement-compliant AI was due December 8, 2009.  The County requested an extension to January 20, 2010, which HUD granted, and then another extension to September 30, 2010.  HUD granted an extension to June 30, 2010.  Five days before that deadline, the County asked for an extension to July 31, 2010. HUD consented to an extension to July 23, 2010.

The County submitted a revised AI to HUD on July 23, 2010. HUD rejected the County's AFFH certification on December 21, 2010.  HUD observed that the AI "provides data and identifies

many issues central to furthering fair housing choice," but failed "to make any material link between those impediments and the actions the County will take to overcome them."  In its detailed six-page letter, HUD described five actions the County could take to make its AI acceptable, including identifying the steps it would take to overcome exclusionary zoning practices. HUD notified the County that it would take formal action on the CPD Funds if the County did not submit an acceptable AI by April 1, 2011.  Following its December 21 rejection of the AI, HUD contacted the County on several occasions to offer technical assistance with the required analysis.

### B. 2011

In 2011, after the United States Attorney's Office notified the County that it would bring an enforcement action, the County submitted another AI.  In response to the AI, HUD listed six restrictive zoning practices that the County's future submissions should address.  When the County submitted another AI, HUD deemed that submission inadequate as well.  The parties then took their disputes to the Monitor.  A more detailed description of these events follows.

### 1. April 13, 2011 AI

On March 24, 2011, one week before its AI was due, the County asked for an extension to May 1, 2011 to submit a revised AI.  HUD denied the request, noting the County's delays in

responding to HUD's offers of assistance and its delays more generally.  HUD warned that it would request that the United States Attorney seek enforcement of the Settlement or pursue administrative remedies if an acceptable AI were not received. The County did not submit an AI on April 1, and on April 6, the United States Attorney advised the County it would act to enforce the Settlement by April 14.

The County submitted an AI on April 13, 2011.  On April 28, HUD refused to approve the new AI, referring once again to the County's commitment in the Settlement to complete an AI acceptable to HUD.  HUD advised the County that its rejection applied to CPD programs covered by the County's FY2011 Action Plan.

On May 13, 2011, HUD explained the reasons for the April 28 rejection of the AI, which it characterized as "substantially incomplete and unacceptable to HUD."  In the nine-page letter, HUD identified seven major deficiencies.  Among other things, HUD explained, the County had not adequately examined the availability of family rental housing, barriers related to patterns of racial and ethnic segregation, exclusionary zoning, and the location of affordable housing.  In connection with exclusionary zoning analyses, the letter identified six zoning practices the County needed to address: (1) restrictions that limit or prohibit multifamily housing; (2) restrictions on the

23

size of a development; (3) restrictions directed at Section 8 or other affordable housing;[7] (4) restrictions that directly or indirectly limit the number of bedrooms in a unit; (5) restrictions on lot size or other density requirements that encourage single family housing or restrict multifamily housing; and (6) restrictions on townhouse development (collectively, "Restrictive Practices").  The letter noted the connection between the location of affordable housing and patterns of racial segregation, explaining that the County's discussion of affordable housing "[did] not adequately address how it will reduce segregation."  Over three days in June, HUD provided the County with technical assistance for a further revision of its AI.

### 2.  July 11, 2011 AI

On July 11, 2011, the County submitted another revised AI. HUD rejected that AI on July 13, 2011.  HUD found that the revision did not meet the Settlement's requirements and did not incorporate the corrective actions identified in HUD's May 2011 letter.  In particular, HUD pointed to the AI's failure to address deficiencies in the "promotion of source-of-income legislation [and its] plans to overcome exclusionary zoning

---

[7] Section 8 refers to an FHA program providing low income housing assistance in the form of vouchers.  See Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 296 (2d Cir. 1998).

practices."  Both parties subsequently sought review before the
Monitor.  In its submission to the Monitor, the County committed
to identifying specific zoning practices that may have
"exclusionary impacts," and, as a last resort, to bringing legal
action against a municipality when a particular project is
blocked or hindered by its exclusionary zoning ordinance.  U.S.
ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v.
Westchester Cnty., N.Y., No. 06cv2860 (DLC), 2011 WL 7563042, at
*6, *8 (S.D.N.Y. Nov. 14, 2011) ("Monitor's 2011 Report").

On November 17, 2011, the Monitor issued a report
concluding that the County was "in breach of its obligation
[under the Settlement] to promote certain 'Source of Income'
legislation."  It also concluded that, "under the terms of the
Settlement, the County should analyze zoning ordinances in
connection with the AI," and found that completion of such
analysis would be "appropriate" by February 29, 2012.  Id. at
*1.  The Monitor explicitly endorsed the six Restrictive
Practices HUD listed in the May 2011 letter, whose impact on
racial disparities the County should, "at a minimum," assess.
Id. at *7.  The Monitor also concluded that the County had to
identify the types of zoning practices that would lead the
County to pursue legal action, if not remedied by the
municipality, and the circumstances that would warrant its use
of litigation.  Id. at *9.  The Monitor did not, however,

address the propriety of HUD's rejection of the AI or the adequacy of the County's AFFH certification because such issues were not "properly joined."  Id. at *1.

## C. 2012

In 2012, the parties litigated the findings in the Monitor's report.  Ultimately, the Monitor's findings were adopted by the Court.  In addition, the County submitted a document in response to HUD's demand that it address the Restrictive Practices.  HUD rejected that document, explaining its reasons for doing so in detail.  HUD reminded the County again that it was in jeopardy of losing its FY2011 CPD Funds. Following litigation, the County was required to provide the Monitor with data that was relevant to an analysis of the zoning ordinances in the municipalities within the County.  These and other events are described below.

### 1. Response to Monitor's 2011 Report

The County objected to some of the conclusions in the Monitor's 2011 Report and appealed the Monitor's decision to the Magistrate Judge, who accepted all but one of the Monitor's findings in a decision in March of 2012.  The County did not object to the Monitor's recommendation that the County analyze the impact of each of the Restrictive Practices in connection with its analysis of zoning ordinances.  It did object, however, to a disclosure of its strategy to overcome exclusionary zoning

26

practices, including identifying the types of practices that would prompt legal action.  Magistrate Judge's Opinion, 2012 WL 917367, at *9.

The Magistrate Judge ruled that the Monitor was permitted under the Settlement to require an analysis of zoning ordinances, and that it could further require the County to "identify the types of zoning practices that would, if not remedied by the municipality, lead the County to pursue legal action" and to "'specify' a strategy that it intends to employ to overcome exclusionary zoning practices" in the AI.  Id.  The Magistrate Judge also noted that the County's AI "must contain certain information and analyses, comply with HUD's Fair Housing Planning Guide, and 'be deemed acceptable by HUD.'"  Id. at *10. The Magistrate Judge found, however, that the County Executive's veto of source-of-income legislation did not constitute a violation of the Settlement.  Id. at *6.  The County did not appeal from any of the Magistrate Judge's rulings, including his finding that the County had an obligation to analyze local zoning ordinances and identify when it would bring litigation to challenge them.  HUD did appeal, however, objecting to the Magistrate Judge's ruling regarding the County Executive's veto of source-of-income legislation.

In May of 2012, this Court granted HUD's objection to the Magistrate Judge's ruling and adopted the sections of the

Monitor's 2011 Report regarding the source-of-income legislation; it adopted the remainder of the Magistrate Judge's Report and Recommendation.  2012 Opinion, 2012 WL 1574819, at *11.  That decision was later affirmed by the Court of Appeals. Appeal Decision, 712 F.3d at 771 (2d Cir. 2013).

### 2.  2012 Zoning Submission

As the litigation was pending in the District Court over that portion of the 2011 Monitor's Report devoted to source-of-income legislation, the County submitted to HUD on February 29, 2012, a Zoning Submission ("First Zoning Submission").  The First Zoning Submission collected zoning ordinances adopted by forty-three local jurisdictions in the County, and included a subsection for each addressing the Restrictive Practices identified by HUD.

On April 20, 2012, HUD notified the County of its intent to reject the FY2012 Action Plan's AFFH certification and of its continuing disapproval of the FY2011 Action Plan.  In a second letter that day, HUD explained to the County that the First Zoning Submission did not comply with the Monitor's directives and that the County had again failed to develop a strategy to overcome exclusionary zoning practices.  HUD reiterated that that failure was "one of the bases for HUD's disapproval of the County's FY2011 Annual Action Plan and rejection of the County's certification that it will affirmatively further fair housing."

The twelve-page letter laid out HUD's analysis of the illegality of exclusionary zoning, citing this Circuit's decision in Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d 926 (2d Cir. 1988),[8] and the New York Court of Appeals's decision in Berenson v. Town of New Castle, 38 N.Y.2d 102 (1975).[9]  HUD noted that the First Zoning Submission did not examine whether any of the restrictions imposed by a local jurisdiction's zoning ordinances "are having exclusionary impacts."  HUD also explained why it did not accept the Submission's conclusion that the County's "analysis has not identified specific local zoning practices that have

_____

[8] Huntington and its progeny set out two ways in which zoning laws, though facially neutral, may be discriminatory under the Fair Housing Act.  A zoning ordinance may perpetuate segregation by restricting multifamily, townhouse, or two-family housing to districts with a disproportionately large minority population, or by disparately impacting minorities by restricting the development of housing types disproportionately used by minority residents.  844 F.2d at 937.  This method of analysis as applied to zoning laws was most recently upheld by the Supreme Court in Texas Dep't of Hous. & Cmty. Affairs, 2015 WL 2473449.  Under Huntington, once there has been a prima facie showing of discriminatory effect, the burden shifts and the municipality must present "bona fide and legitimate justifications for its action with no less discriminatory alternatives available."  Huntington, 844 F.2d at 939.

[9] Berenson establishes the framework for evaluating zoning ordinances under state law.  Under Berenson, a municipality must first provide a properly balanced and well-ordered plan for the community.  38 N.Y.2d at 110.  Then, municipalities just consider, weigh, and balance both local and regional housing needs due to the effect that zoning ordinances may have on areas outside the municipality.  Id.

exclusionary impacts."  HUD observed that the conclusion was not supported by either data or an appropriate methodology and not based on applicable legal principles.  The letter also listed four steps, drawn from the Monitor's 2011 Report, that the County should take to develop a clear strategy to address exclusionary zoning practices.

It is noteworthy that HUD's criticism in 2012 of the County's conclusion -- that local zoning ordinances did not have an exclusionary impact -- is echoed in HUD's correspondence in 2013 and 2014.  HUD has consistently asserted that the County's conclusion was unsupported by data or any appropriate methodology.

Meanwhile, on March 15, 2012, the County submitted its proposed Action Plan and Certification for FY2012 CPD funds.  On April 20, 2012, HUD notified the County that it intended to reject the County's FY2012 Certification due to the failure of the County's revised AI to "sufficiently address deficiencies regarding promotion of source-of-income legislation or plans to overcome exclusionary zoning practices, which were required pursuant to the terms" of the Settlement.  The letter reminded the County that the Settlement "vests authority for approval of the AI exclusively in HUD."

On April 27, HUD provided the County with a formal notice of disapproval of its FY2012 Action Plan.  Noting that the

County "has been on notice about [AI] deficiencies now for years," HUD stated its expectation "that the County will substantively comply with the requirements HUD has set forth for its AI." HUD listed those requirements, noting that fulfilling them would permit HUD to approve the FY2011 and 2012 annual Action Plans and allow the grants for those years to go forward. The County never responded to this letter.

In a letter of May 14, 2012, the Monitor noted numerous deficiencies in the County's Zoning Submission and requested a revised AI and Housing Strategy, as well as certain documents and communications relating to the Submission. The County responded on July 6, 2012, with a Second Zoning Submission containing its own legal analysis and a report by the Land Use Law Center ("LULC Report").

### 3. 2012 Motion to Compel

The United States Attorney then filed a motion to compel the County to provide a response to the Monitor's information requests of May 14, 2012. At a conference with the Court on July 25, the County confirmed its intent to comply with its obligations under the Settlement and acknowledged that there was a difference between an analysis of affordable housing and one of fair housing. The County was ordered to respond to the Monitor's outstanding requests for information by the deadlines to which the parties agreed during a conference in the

courthouse.  The Court also established a dispute resolution process for any future objections by the County to requests for information.

The County supplied a Third Zoning Submission and provided additional information to the Monitor on eight dates between July 31 and October 5, 2012.  In response to requests from the Monitor, the County filed a Fourth Zoning Submission in November 2012.

**D. 2013**

Early in 2013, HUD formally rejected the County's 2012 Zoning Submissions.  In response to HUD's notice that it was reallocating FY2011 Funds, the County simultaneously filed suit to challenge the decision and submitted its first revised AI since 2011.  HUD found the revised AI inadequate, as it did two additional Zoning Submissions subsequently submitted to supplement the AI.  HUD provided the County yet another detailed explanation of what would be required to make its AI adequate. Amid this, the Monitor released its first report analyzing fair housing patterns in the County.  These events are described in more detail below.

**1. Rejection of 2012 Zoning Submissions**

In a ten-page letter of March 13, 2013, HUD explained in detail why the County's Zoning Submissions of 2012 remained inadequate.  It emphasized the County's failure to "conduct a

proper analysis of exclusionary zoning" as well as its continuing failure "to develop a strategy to overcome exclusionary zoning practices."  HUD concluded that the County's prior submissions, taken together, "fail to meet the Settlement's requirements for an acceptable AI" and its "refusal to meet the Settlement's requirements stand[] as an obstacle to HUD's approval of the County's FY2011 and FY2012 Annual Action Plans."

On March 15, the County submitted its FY2013 Action Plan to HUD.  HUD responded in a letter of April 19, described below.

### 2. April 24, 2013 AI

On March 25, 2013, HUD advised the County that it intended to reallocate roughly $7.4 million in FY2011 CDBG, HOME and ESG funding.[10]  HUD explained that the County had not provided a satisfactory certification that it would comply with its obligation to AFFH as part of its FY2011 annual Action Plan. HUD warned that to avoid permanent loss of the funds, the County must provide by April 25, inter alia, "a satisfactory zoning analysis and plan to overcome exclusionary zoning practices." (Emphasis in original.)

---

[10] The breakdown was roughly $5.4 million in CDBG funds, $1.7 million in HOME funds, and $400,000 is ESG funds.

By letter of April 4, the County argued that it had complied with all of HUD's procedural requirements.  It argued that "[b]ased upon the analysis already conducted by the County, and the test set forth in the [LULC Report], the County . . . determined that there was no exclusionary zoning within Westchester County under Berenson."  Focusing exclusively on its statutory obligations, the County contended that it had satisfied each of them and was entitled to receive CPD funds. The County argued that "HUD cannot condition the disbursement of CPD funds upon a 'Huntington analysis' of local zoning" because the "relevant question is whether the municipalities receiving CPD funds can satisfy their obligation to AFFH generally at the time that the FY2011 CPD funds are expended."  It added that HUD's actions are in violation of § 12711 of Title 42.

In a letter of April 16, HUD reaffirmed that the April 25 deadline for receipt of substantive assurances would be enforced.  Otherwise, HUD would begin the process of reallocating the FY2011 funds to other eligible jurisdictions. HUD reminded the County that it had not submitted a revised AI since July 2011.  In recapping HUD's analysis of the deficiencies in the County submissions, HUD referred again to the Settlement's explicit requirement that the County submit an AI acceptable to HUD.

On April 19, HUD notified the County that it intended to reject the County's certification to AFFH submitted with its FY2013 Action Plan.  In response, on April 24, the County submitted an updated AI.  This was the first revision that the County had made to its AI since 2011.

The April 2013 AI retained the revisions made in July 2011 and incorporated the data and information in the County's 2012 submissions to HUD and the Monitor.  It also provided an update to Chapter 12, "Current Impediments and Fair Housing Action Plan," in response to HUD's March 2013 letter.  In all, the April 2013 AI contained 236 pages over twelve chapters.  It included voluminous appendices as well.  Among these were the County's previous zoning submissions, and, as Appendix 51, the County's Sixth Zoning Submission.[11]

The Sixth Zoning Submission consists of 31 separate analyses -- one per eligible municipality.  It purports to be an analysis of the disparate impact on minorities of each municipality's zoning ordinances.  Each analysis ranges in length from seven to over twenty pages and includes "a narrative analysis" of the data provided in the analysis; a map of the

---

[11] The County has not updated the text of the AI proper since April 2013:  Subsequent revisions have been to the attached Zoning Submission, and these have been styled as "supplements" to the AI.

municipality; and three tables showing comparative population data accounting for race, type of housing, and minimum lot size. Each also discusses the presence of the Restrictive Practices identified by HUD in its May 2011 Letter by evaluating relevant ordinances with reference to those practices.  Each analysis ended with the statement "Therefore, the County has concluded that [the municipality's] zoning ordinance does not show a separate or segregative impact on minorities and does not pose an impediment to AFFH with respect to race."

On April 26, HUD notified the County that HUD was disapproving its FY2013 Action Plan because the AI constituted "insufficient evidence to support the accuracy of the County's FY2013 AFFH certification."  In a letter of May 10, HUD provided the County the specific reasons for HUD's disapproval of the FY2013 Action Plan.  It reminded the County that its FY2012 Action Plan had previously been disapproved as "substantially incomplete" and that the deficiencies identified then had not been remedied.  It also committed that it would approve the annual Action Plans for FY2011, 2012 and 2013 if the County provided eight specific assurances.  In a multi-page attachment, HUD described in detail the deficiencies in the County's most recent AI, and required any revision or resubmission of the FY2013 Action Plan to be made by June 10, 2013.

36

### 2.   Supplemental AI Submissions

The County made no submission on June 10, but on June 13 it provided a Seventh Zoning Submission, consisting of revised zoning analyses for five local jurisdictions.  The County indicated that, if the revised analyses were acceptable to HUD, it would conduct such an analysis with respect to the remaining twenty-six municipalities.  On July 12, having reviewed the Seventh Zoning Submission, HUD again rejected the County's FY2013 Certification.  HUD offered to make resources available to assist the County in finalizing its zoning analysis and strategy, however, "as long as progress is being made."  On July 23, the County provided HUD with an Eighth Zoning Submission, consisting of revised analyses of ten jurisdictions, including the five from the Seventh Zoning Submission but with further revisions.  The County offered again to conduct similar analyses of the remaining municipalities provided the methodology was acceptable.

### 3.   Monitor's 2013 Report

The Monitor has issued two reports analyzing the zoning ordinances in the municipalities within the County.  They were issued on July 31, 2013 and September 8, 2014 ("Monitor's 2013 Report" and "Monitor's 2014 Report").  The Monitor has also requested relevant data from the municipalities, many of which

have complied with those requests, and engaged in discussions with several municipalities about fair housing issues.

In response to the County's assertion that there is no evidence of exclusionary zoning in any of 31 municipalities in the County, the Monitor undertook his own analysis.[12]  The Monitor's 2013 Report analyzed each jurisdiction's zoning regulations and gave each jurisdiction an opportunity to respond to the accuracy of his findings.  The Monitor concludes that the regulations in 24 of the 31 "are not exclusionary," but that the zoning codes in seven required a "more searching analysis." These seven municipalities had zoning codes that did not provide meaningful opportunities for affordable housing and, "when viewed in the light of applicable state and federal law, [were] exclusionary."  Therefore, the Monitor concluded, the County's assertion that exclusionary zoning is absent from the County "is strongly contradicted by its own data."  The Monitor did not find that any particular zoning ordinance actually had a segregative effect, but concluded that a Huntington analysis was required.  The Monitor directed the County to, among other things, "identify the steps it will take to ensure that the municipalities make provision for affordable housing, including,

---

[12] The Monitor engaged experts from the Pratt Graduate Center for Planning and the Environment to assist him.  They are John Shapiro, Brian Kintish, and Alix Fellman.

but not limited to, modification of certain zoning regulations .
. . ."  The final version of the Monitor's 2013 Report was
issued on September 13, 2013, but did not differ in any material
respect.

The release of Monitor's 2013 Report had concrete effects.
At least six of the seven municipalities it identified as
problematic entered into a dialogue with the Monitor about
possible changes to their zoning ordinances.  Ultimately,
Mamaroneck, Ossining, and Pound Ridge chose to amend to their
zoning ordinances to make them less exclusionary.

### 4. August 9, 2013 Letter from HUD

HUD responded to the County's July 23 submission on August
9, 2013 ("August 2013 Letter").  This letter, which the County
contends is one of the most significant to this litigation,
concluded that the County's July 23 Zoning Submission
"demonstrate[d] meaningful progress" but that it continued to
fail "in critical aspects previously identified by HUD."  After
describing the analysis in the July 23 Zoning Submission which
HUD found appropriate, it took issue with the County's continued
assertion that local zoning ordinances "do not have a disparate
impact on minorities."  HUD found the conclusion not supported
by the available data or an adequate disparate impact analysis.
Observing that the County acknowledged that Restrictive
Practices exist in these municipalities and that they have the

39

effect of limiting the availability of affordable housing, HUD criticized the County for its refusal to acknowledge "any connection between zoning restrictions" that affect affordable housing and those that affect fair housing.  Accordingly, HUD continued to find that the County's AI was unacceptable.

Because time was of the essence for reallocation of the FY2011 funds, HUD required the County to provide evidence that it was capable of conducting an adequate disparate impact analysis by August 15 with respect to one of three municipalities recently identified by the Monitor as having exclusionary zoning practices.[13]  It also required the County to sign and submit, by August 15, four "special assurances."  These assurances were (1) an acknowledgement that the County had "an ongoing duty to [AFFH] that includes compliance with the 2009 Settlement"; (2) that the County would "adopt[] and incorporate[] by reference into its [AI] the findings of the [Monitor's 2013 Report] and will comply with [the Monitor's] recommendations and information requests"; (3) that the County would submit a final Zoning Submission by October 15 consistent

---

[13] In the Monitor's 2013 Report, the Monitor found that seven jurisdictions -- Croton-on-Hudson, Harrison, Lewisboro, Mamaroneck, Ossining, Pelham Manor, and Pound Ridge -- had exclusionary zoning practices.  The August 2013 Letter's request was with respect to three of these: Lewisboro, Ossining, and Pound Ridge.

with the content of HUD's August 2013 Letter, and incorporate that Submission into the AI; and (4) that the County would "adopt[], incorporate[] by reference, and commit[] to implementation of" a HUD-prescribed "Strategy on Exclusionary Zoning."

The County did not give the requested assurances.  Instead, by a letter of August 13, the County rejected HUD's critiques, insisted that its analyses were "extensive, well documented and complete," and objected to HUD's requested assurances as unreasonable demands.  The County proposed as an alternative that HUD provide the CPD Funds to New York State to administer on the County's behalf.  As HUD had previously explained to the County, however, HUD believed it only had statutory authority to do that with respect to ESG funds.  Accordingly, in a letter of August 16, HUD explained that it would be reallocating the FY2011 Funds.  On August 19, HUD made available the roughly $400,000 in FY2011 ESG funds to the State of New York.

### 5.  County's 2013 Lawsuit

Having been informed again on April 16 that HUD intended to reallocate FY2011 CPD Funds, the County took two actions on April 24, 2013.  It submitted the revised AI to HUD, as described above, and filed a complaint in this Court.  The complaint challenged HUD's denial of FY2011 Funds in its April 16, 2013 letter, bringing three claims under the APA and one

claim under 42 U.S.C. § 12711.[14]  The first APA claim sought an
injunction under 5 U.S.C. § 705; the second two alleged that
HUD's denial was arbitrary and capricious for imposing a more
stringent standard on the County than similarly situated
applicants and for failure to comply with the Settlement.

On April 26, 2013, the Court denied the County's
application for a temporary restraining order and declined to
grant the County's application for a preliminary injunction.  In
an Opinion of August 13, 2013, this Court determined it lacked
subject matter jurisdiction over the County's three APA claims
and that the County failed to adequately plead that HUD breached
§ 12711 by conditioning funding on implementing source-of-income
legislation; the Court accordingly dismissed all four claims.
2013 Opinion, 2013 WL 4400843, at *4-5.  The County appealed
this decision and sought a preliminary injunction from the Court
of Appeals for the Second Circuit.  The Court of Appeals denied
the County's motion for a preliminary injunction on September
25, 2013, and, as described further below, held on February 18,
2015 that subject matter jurisdiction exists as to those FY2011
funds that had not yet been reallocated.

---

[14] The § 12711 claim is moot.  It alleged that HUD had improperly
conditioned receipt of the funds on implementing source-of-
income legislation.

42

**E. 2014**

In 2014, HUD notified the County that its FY2012 Funds would be reallocated, but outlined specific steps -- including four special assurances -- that the County could give to prevent reallocation.  HUD also rejected the County's FY2014 Action Plan, and the Monitor released a report that built upon his 2013 Report.  These events are described in more detail below.

**1. Special Assurances**

On April 23, 2014, noting that the County had never provided the assurances requested two years earlier (on April 27, 2012), HUD advised the County that it intended to reallocate the FY2012 CPD Funds.[15]  HUD also recounted that, because of "the County's inaction and refusal to design its own solution, HUD [had] provided the County with a roadmap to coming into compliance with the Settlement and its AFFH obligations."  HUD observed that the County

> has not provided a productive alternative way to come into compliance with the Settlement Agreement and its AFFH obligation.  Instead, the County has steadfastly refused to revise its [AI] to include an adequate analysis of restrictive zoning practices and a strategy to overcome exclusionary zoning.

HUD reminded the County that the Settlement required the County to submit an AI "deemed acceptable by HUD."

---

[15] The FY2012 funds included approximately $4 million in CDBG Funds, $800,000 in HOME Funds, and $500,000 in ESG Funds.

Despite a long record of unfulfilled requests, HUD gave the
County yet another opportunity to delay reallocation.  If the
County agreed by May 7, 2014 to provide four "special
assurances" attached to the letter, the FY2012 and 2013 Action
Plans would be approved and the funds awarded "upon timely
satisfaction of all submission requirements."  Otherwise, the
FY2012 CPD Funds would be reallocated.

The four special assurances ("Assurances") were largely
duplicative of those outlined two years earlier.  The fourth
required the County to commit to implementation of an attached
one-page strategy to overcome exclusionary zoning practices
("Strategy").  The Strategy involved three steps: identifying
municipalities with Restrictive Practices that may potentially
have discriminatory exclusionary effects; communicating with the
municipality to seek removal or reduction of unjustifiable
restrictions with potentially discriminatory exclusionary
effects; and, after exhausting efforts to obtain cooperation,
engaging in enforcement activities, which might include filing
litigation or making a referral to the U.S. Department of
Justice.

The County did not give the Assurances by May 7, 2014.  As
described below, HUD relied again on the Country's refusal to
provide these Assurances and to adopt the Strategy to overcome
exclusionary zoning practices when it rejected the Country's

FY2014 Action Plan.  On May 9, 2014 the County informed HUD that it would not be seeking requalification under the CPD programs for the FY2015-17 cycle.

### 2. Efforts by Board of Legislators

During May 2014, Robert Kaplowitz ("Kaplowitz"), Chairman of the County's Board of Legislators ("BoL"), sought to postpone the reallocation of FY2012 funds by proposing that the BoL pursue the enactment of legislation that would provide the Assurances to HUD.  HUD agreed to postpone any irrevocable action on the FY2012 Funds until June 9, 2014.  The parties have pointed to no evidence that the County ever provided HUD with the Assurances it sought, whether through legislation or otherwise.

On May 30, 2014, HUD advised the County that it continued to disapprove the County's AI and subsequent Zoning Submissions. HUD cited the County's failure to provide an adequate plan to overcome exclusionary zoning practices, as previously enumerated in the May 2011 letter describing the six Restrictive Practices the County was required to address.

Shortly thereafter, on June 5, the County submitted its FY2014 Action Plan to HUD.  The FY2014 Action Plan was a 62-page document with ten sections and hundreds of pages of appendices. Each of the ten sections is addressed to specific statutory and regulatory requirements.  Most significantly, Section A contains

45

the County's grant application, as well as its express AFFH
Certification.  The AFFH Certification is signed by the County
Executive, with the signature dated June 2, 2014.

### 3. HUD Rejection of FY2014 Action Plan

On June 27, 2014, HUD notified the County of its intent to
reject the FY2014 Action Plan's AFFH Certification.  It
explained that the County had failed to take the steps outlined
in HUD's April 23, 2014 letter to gain approval for the FY2012
and FY2013 Action Plans and that the inadequacy of the AI would,
without prompt action by the County, result in the rejection of
the FY2014 Action Plan as well.  HUD offered the County "an
additional opportunity to provide evidentiary support for its
AFFH certification" before a final decision, and required the
County to submit by July 8 a written response and specific
evidence to support the 2014 AFFH Certification.

Having received no response from the County, on July 18,
2014, HUD formally rejected the AFFH Certification in the FY2014
Action Plan as "inaccurate."  It disapproved the Action Plan in
its entirety as "substantially incomplete."  The letter
explained once again that HUD was taking this action because the
County had failed to provide "an adequate" AI and had, moreover,
had given the Department "no assurance that it plans to come
into compliance with its AFFH obligations."  It once again
attached the Assurances and Strategy and gave the County until

46

September 1, 2014, to submit them to HUD.  The County did not comply.

### 5. Monitor's 2014 Report

Besides seeking a delay in the reallocation of funds in May 2014, Kaplowitz also sought help from the Monitor.  He requested that the Monitor prepare a <u>Huntington</u> analysis of the 31 eligible municipalities' zoning ordinances to aid the County in completing its AI.  While the Monitor's earlier report had highlighted the steps that the County needed to undertake to comply with the law, the Monitor had not himself conducted that evaluation of the zoning ordinances under the <u>Huntington</u> standard.  In response to this request for assistance, the Monitor described his proposed methodology to the parties on May 27, 2014, and requested any objection to that methodology by June 5.  The County promptly objected to the methodology.

On September 8, 2014, the Monitor issued his 2014 Report. The Report, an extension of the Monitor's 2013 Report, analyzed at length the discriminatory impact of each municipality's zoning code on the County's minority residents.  It concluded that there was <u>prima facie</u> evidence that six municipalities -- Harrison, Larchmont, Lewisboro, North Castle, Pelham Manor, and

Rye Brook -- had zoning codes that are presumptively exclusionary under federal law.[16]

### F. 2015

#### 1. Ruling Regarding Judicial Review

On February 18, 2015, the Second Circuit affirmed the 2013 Opinion's dismissal of the County's claims but only "insofar as they seek relief with respect to already reallocated funds." 2015 Opinion, 778 F.3d at 417.  Because reallocated funds are unavailable to the County, any claims to those funds are moot. This includes all of the FY2011 Funds administered under the CDBG and ESG programs.  With respect to the approximately $753,000 in HOME funds that had not been reallocated, however, the Second Circuit found that the County's claims were subject to judicial review and remanded the case.  The Second Circuit did not reach the question of whether judicial review was available under the CDBG and ESG programs.

#### 2. FY2013-2014 Reallocation

As noted above, on May 9, 2014, the County notified HUD that it did not intend to requalify as a CDBG urban county for the FY2015 to FY2017 period.  On February 3, 2015, HUD advised the County that its failure to receive a grant for FY2012 (due

---

[16] The Monitor noted the "considerable progress" made by Mamaroneck, Pound Ridge, and Ossining since the Monitor's 2013 Report.

to the County's failure to take satisfactory remedial action and the reallocation of the funds) had resulted in the termination of its qualification as an urban county.  Until the County requalifies as a CDBG urban county and as a HOME participating jurisdiction, the letter explained, it would not receive FY2015 Funds or any future funds.  The termination also affected the remainder of the County's FY2013 and FY2014 Funds, and HUD advised the County that it would proceed to reallocate them as well.  The ESG Funds would be reallocated to the State for use within the County pursuant to federal regulation.

### 2. Reallocation Status

Given the County's decision to not seek to qualify to receive CPD Funds for FY2015 or thereafter, the funds that remain at stake in this litigation are those for essentially two years.  As reflected in the chart below, some of the FY2011 Funds were reallocated, and some were essentially lost for use in community development programs.[17]  The FY2012 Funds were reallocated to other jurisdictions.  Therefore, it is primarily the fate of the FY2013 and FY2014 Funds that remains undecided.

---

[17] All but $752,844 of the HOME Funds had been reallocated by September 30, 2013, at which point the remainder reverted to an expired account.  No other jurisdiction, therefore, can receive these funds.  The County will not receive the funds unless they submit to HUD an AI deemed adequate by September 30, 2018, at which point they will revert to the federal Treasury.

HUD must grant the FY2013 Funds by September 30, 2015, however, or they cannot be reallocated to another jurisdiction and will effectively be lost for use in housing and community development programs.[18]  2015 Opinion, 778 F.3d at 417 n.8.  The statutory lapse date is September 30, 2016 for the FY2014 funds.  The table below summarizes the current status of the CPD Funds.

| Funds | Reallocation Notice | Lapse Date | Committed |
|-------|---------------------|------------|-----------|
| **2011** | | | |
| CDBG | | | Yes |
| ESG | March 25, 2013 | September 30, 2013 | Yes |
| HOME | | | In Part |
| **2012** | | | |
| CDBG | | | Yes |
| ESG | April 23, 2013 | September 30, 2014 | Yes |
| HOME | | | Yes |
| **2013** | | | |
| CDBG | | | No |
| ESG | February 3, 2015 | September 30, 2015 | No |
| HOME | | | No |
| **2014** | | | |
| CDBG | | | No |
| ESG | February 3, 2015 | September 30, 2016 | No |
| HOME | | | No |

The reallocation process varies with each program.  In total, the County stood to receive approximately $10,113,000 of CDBG and HOME funds in FY2013 and FY2014.  Those funds have been added to total FY2015 allocations for eligible grantees.  Thus, the County's FY2013 CDBG Funds are in the process of being

---

[18] As HUD explained at the March 27, 2015 hearing, the reallocation process is an intricate and time-consuming process. Accordingly, while the lapse date is September 30, the time actually required for reallocation spans months.

reallocated to Yonkers and Mount Vernon, which apply independently of the County for CPD Funds, to New York City, and to dozens of other municipalities in the region.  The FY2013 and FY2014 HOME funds -- approximately $1,822,000 -- are in the process of being reallocated to approximately 588 municipalities nationwide.  The $623,682 in FY2013 and FY2014 ESG Funds are in the process of being reallocated to the State of New York.

Beginning the reallocation process, however, does not commit funds to grantees.  To receive reallocated HOME funds as part of their FY2015 grant, each municipality must submit its annual Action Plan to HUD for review and approval; HUD must complete its review within 45 days.  The right to the funds passes to the grantee when a grant agreement is entered following that approval.  Grant funds must be distributed pursuant to a valid agreement by September 30 for a jurisdiction other than the County to receive the funds.  In light of an injunction that has been entered, which is described below, HUD has halted the obligation of the County's CPD funds pending further judicial action.[19]

---

[19] Given that HUD must approve or reject Action Plans within 45 days of submission, in the event the injunction is lifted, it is unclear from the parties' submissions whether applicants who filed Action Plans more than 45 days earlier will have lost the opportunity to receive CPD Funds.

### 3. 2015 Lawsuit

On March 17, the County filed a second lawsuit claiming that HUD's denial of its AFFH Certifications violated the APA, 42 U.S.C. § 12711, and the Equal Protection and Due Processes Clauses of the Fifth Amendment.[20]  On March 19, the County filed a motion for a preliminary injunction.  That motion was denied on March 27, and an expedited briefing schedule for this summary judgment motion practice was set.  HUD moved for summary judgment on April 17.  The County opposed that motion, and cross-moved for summary judgment on May 1.  Briefing was fully submitted on May 22.

The County appealed this Court's denial of the preliminary injunction ruling.  On April 20, the Second Circuit granted an injunction pending appeal, ordering that HUD not obligate (or otherwise reassign or alienate) the County's entitlement FY2013-2014 CPD Funds pending resolution by the Court of Appeals of the appeal.

### 4.  Monitor's May 2015 Report

Most recently, on May 8, 2015, the Monitor filed a Report regarding implementation of the Settlement.  The Monitor found that the County had breached the portions of the Settlement

---

[20] This complaint, 15cv1992 (DLC), and the 2013 lawsuit, 13cv2741 (DLC), were consolidated on April 15, 2015.

requiring that the County have "financing in place" for 450 affordable housing units by December 31, 2014, because the County's legislation providing funding included conditions that were not met until after the deadline.  The Monitor also found that the County has not discharged its duties to pursue all available means to overcome municipal resistance to the Settlement's affordable housing objectives.

On June 16, the County filed its objections to the Monitor's 2015 Report.  The issue is <u>sub judice</u> before the Magistrate Judge.

**DISCUSSION**

When a court is called upon to review agency action under the Administrative Procedure Act ("APA"), the question presented "is a legal one which the district court can resolve on the agency record . . . on a motion for summary judgment."  <u>Univ. Med. Ctr. of S. Nevada v. Shalala</u>, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999); <u>see also</u> <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  The Court of Appeals having decided that the County is entitled to judicial review of HUD's decision to deny funding to the County under the HOME statute, the first question to address is whether the County is also entitled to judicial review of the decisions to withhold funding

under the CDBG and ESG statutes.[21]  Finding that judicial review
is available to the County, the Opinion will then address
whether HUD acted within its discretion and whether the County's
reliance on two provisions of the HOME statute alters a
conclusion that HUD acted lawfully.

**I. Subject Matter Jurisdiction**

The Second Circuit held in the 2015 Opinion that judicial
review was available over the agency's denial of HOME Funds.
778 F.3d at 419-20.  Finding that reallocation of CDBG and ESG
funds rendered that portion of the appeal moot, however, it did
not reach the issue of whether a decision denying funds under
the CDBG or ESG programs is similarly reviewable.  Id. at 417.
While different statutes govern these programs, the requirements
and language used overlap.  Given the similarities among the
statutes, HUD's decision to deny funding under the CDBG and ESG
statutes appears also to be reviewable.[22]

Under the APA, a party aggrieved by agency action is
generally "entitled to judicial review thereof."  5 U.S.C. §
702; see Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir.

---

[21] Any dispute regarding HUD's decisions to withhold FY2012 CPD
Funds and FY2013 lead paint reduction funds are moot because the
funds have been reallocated.

[22] Both the County and HUD urge this Court to reach the merits of
the APA challenge even in the event it concludes that HUD's
decisions are not subject to judicial review.

2009) (noting the "strong presumption that Congress intends judicial review of administrative action").  But, judicial review is not available "to the extent that . . . agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This exception to judicial review, however, "applies only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."  Sharkey v. Quarantillo, 541 F.3d 75, 91 (2d Cir. 2008) (citation omitted).

The Second Circuit concluded that several provisions of the HOME statute limit HUD's ability to approve or reject a jurisdiction's application for grant funding.  As a consequence the statute was not "drawn in such broad terms" that there is no law to apply on judicial review.  2015 Opinion, 778 F.3d at 420 (citation omitted).  The CDBG and ESG statutes contain sufficiently comparable provisions to dictate the same finding.

For instance, the CDBG statute provides six criteria that applicants must satisfy in order to receive a grant, including that the grant "be conducted and administered in conformity with . . . the Fair Housing Act," including the AFFH certification requirement.  42 U.S.C. § 5304(b).  And while the ESG statute does not contain any separate eligibility criteria, it states that ESG grants shall be allocated in accordance with the

allocation of CDBG grants under § 5304(b); it may, therefore, fairly be evaluated by the CDBG criteria.

The Second Circuit also held that the references to the Secretary's exercise of discretion in the HOME statute, and in the agency regulations as well, did not "negate" the statutory provisions that impose limitations on that agency discretion. 778 F.3d at 421.  Thus, the reference in the HOME statute to conditions being met to the "satisfact[ion] [of] the Secretary" was insufficient to divest the court of jurisdiction.  See 42 U.S.C. § 12708; 2015 Opinion, 778 F.3d at 421.  A similar reference to the Secretary's discretion, and the requirement that the grantee's certification satisfy the Secretary, appears in the CDBG statute.  See 42 U.S.C. § 5304(b).  For the reasons explained by the Court of Appeals, this recognition of agency does not exclude review.

Defendants argue that judicial review of CDBG and ESG grants is precluded because those statutes are distinguishable from the HOME statute.  Among other things, the CDBG statute allows a recipient of CDBG payments to file a petition in the Court of Appeals for review of HUD's decision to terminate, reduce, or limit those payments.  Id. § 5311(c).  Defendants argue that the specific grant of a right to review a HUD decision in that one set of circumstances implies that judicial

review is unavailable here, where the decision at stake is one to grant funds under § 5304.

These arguments have some force.  Nevertheless, given the similarities between the HOME statute on the one hand and the CDBG and ESG statutes on the other, the thrust and reasoning in the Second Circuit's decision in 2015 Opinion, and the basic presumption that judicial review exists under the APA, this Court concludes that HUD's decision to deny CDBG and ESG funds also appears to be reviewable by this Court.

## II. Application of Arbitrary and Capricious Standard

The County moves for summary judgment on the ground that HUD's August 9, 2013 and July 18, 2014 decisions to withhold CPD Funds were arbitrary and capricious.  Although the complaints it filed to begin these two consolidated actions are more broadly worded, the County's motion (as well as its opposition to HUD's own motion for summary judgment) rests almost exclusively on its argument that HUD exceeded its statutory authority under 42 U.S.C. §§ 12705(c)(1) and 12711 when it denied funding.  The County asserts that these two statutes forbid HUD from withholding funds because of its desire to change local zoning ordinances.  The County's reliance on those two statutes, which are contained in the HOME statute only, are addressed at the end of this Opinion.

HUD also moves for summary judgment.  It contends that its decisions to reject the County's AIs and AFFH Certifications were neither arbitrary and capricious nor contrary to its statutory grant of authority.  The parties agree that the appropriate standard of any court review of the actions taken by HUD here is the arbitrary and capricious standard.  See, e.g., Guertin v. United States, 743 F.3d 382, 385-86 (2d Cir. 2014).

The APA permits a court to "compel agency action unlawfully withheld" and set aside an agency's determination if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In reviewing agency action, a court may not "substitute its judgment for that of the agency."  Judulang v. Holder, 132 S. Ct. 476, 483 (2011) (citation omitted).  The scope of review under this standard is narrow because, among other reasons, "a court must be reluctant to reverse results supported by a weight of considered and carefully articulated expert opinion."  Fund for Animals v. Kempthorne, 538 F.3d 124, 132 (2d Cir. 2008) (citation omitted).

"Nevertheless, [the court's] inquiry must be searching and careful . . . [and] [t]he record must show that the agency examined the relevant data and articulated a satisfactory explanation for its action."  Nat. Res. Def. Council v. EPA, 658 F.3d 200, 215 (2d Cir. 2011) (citation omitted).

> In addition, agency action is arbitrary and capricious
> if the agency has relied on factors which Congress has
> not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered
> an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view
> or the product of agency expertise.

Id. (citation omitted). See also Guertin, 743 F.3d at 385-86;

Bechtel v. Admin. Review Bd., 710 F.3d 443, 446 (2d Cir. 2013)

Moreover, although a court may "uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned,

[the court] may not supply a reasoned basis for the agency's

action that the agency itself has not given."  Nat. Res. Def.

Council, 658 F.3d at 215 (citation omitted).

### A. Statutory Framework

The CDBG and HOME statutes each require that grantees

certify that they will AFFH.  Recipients of CDBG funds are

required to certify that, inter alia, "the grant will be

conducted and administered in conformity with the Civil Rights

Act of 1964 and the Fair Housing Act, and the grantee will

affirmatively further fair housing"; recipients of HOME funds

are required to certify that "the jurisdiction will

affirmatively further fair housing."  42 U.S.C. §§ 5304(b)(2),

12705(b)(15).  The HOME statute explicitly requires that

Certifications be "based on supporting evidence" and that a

review of such evidence may be grounds for HUD finding a Certification inaccurate.  Id. § 12704(21).

The duty to AFFH encompasses the duties to "conduct an analysis of impediments to fair housing choice within the area, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard."  24 C.F.R. §§ 91.225(a)(1) (HOME); id. § 570.601(a)(2) (CDBG). These obligations require the grantee to analyze the impact of race on housing opportunities and choice in its jurisdiction, including any impediments erected by race discrimination or segregation.  668 F. Supp. 2d at 552.  Therefore, to receive CDBG and HOME Funds, applicants must submit the required Certification supported by the required AI.

**B. HUD Letters**

The two HUD letters to which the County principally objects are the letters of August 9, 2013 ("2013 HUD Letter") and the letter of July 18, 2014 ("2014 HUD Letter").  Although each of these letters has been described above, for ease of reference, they are described again here.

In the 2013 HUD Letter, HUD rejected the County's 2013 AI, submitted on April 24, 2013, as well as its Seventh and Eighth Zoning Submissions ("AI Supplements"), which the County submitted on June 13 and July 23, 2013, and which were addressed

to zoning ordinances in, respectively, five and ten municipalities.  The 2013 HUD Letter advised the County that it would move forward with the process of reallocating FY2011 CPD Funds absent sufficient evidence to support the County's Certification to affirmatively further fair housing.

The 2013 HUD Letter recounted reasons HUD had found the County's submissions since 2010 to be deficient, as well as the steps HUD and the Monitor had taken to assist the County.  It described the Monitor's requests for data from the County and his use of that data to produce his own report on the zoning practices within the County.  HUD recited the Monitor's conclusion that "the data shows that zoning restrictions in some of the seven municipalities may serve to perpetuate segregative housing patterns and may have a disparate impact on racial and ethnic minorities, and therefore may violate federal law," and the Monitor's finding that "the County's conclusion that exclusionary zoning does not exist anywhere in Westchester County is not supported by its own data."

HUD explained that, with the County's adoption of source-of-income legislation, the "only issue holding up the acceptability of the County's AI is the inadequacy of its plans to overcome exclusionary zoning practices."  Acknowledging that

the County had made progress in its analysis of existing zoning

ordinances,[23] HUD objected that

> the County continues to assert that local zoning
> ordinances do not have a disparate impact on
> minorities and that the County "has concluded that
> [the municipality's] zoning ordinance does not show a
> disparate or segregative impact on minorities and does
> not include provisions that can be identified as
> impediments to AFFH with respect to race or ethnicity.

Explaining the reason for its objection, HUD stated that the

County's

> conclusions are simply not supported by the available
> data and do not reflect an adequate disparate impact
> analysis.  As the County itself acknowledges,
> Restrictive Practices exist in these municipalities
> that have the effect of limiting the availability of
> affordable housing.  Such limitations may in fact have
> an exclusionary effect based on race, national origin,
> or familial status, which the data supports.  The
> refusal to acknowledge any connection between zoning
> restrictions that affect the availability and location
> of affordable housing and fair housing protections
> directly challenges the Court's rulings on the matter
> and the Settlement itself.  HUD therefore cannot
> accept the County's Zoning Submission.  Thus, the
> County's AI remains unacceptable.

(Emphasis added.)

---

[23] For instance, HUD pointed out that the 2013 AI acknowledged
that the percentage of the single-race Black population and of
the Hispanic population is lower in ten municipalities than in
the County as a whole.  The County had also identified changes
that each municipality might undertake to its zoning ordinance
in order to increase the supply of affordable and multifamily
housing.

Noting that "[t]ime is of the essence due to the
reallocation process and potential lapse of the fiscal year 2011
formula grant funding," HUD required

> special assurances and evidence that the County is
> capable of conducting an adequate disparate impact
> analysis.  In order to provide sufficient evidence to
> support the certification to [AFFH], the County must
> provide the attached special assurances and
> demonstrate that it can complete an amended
> exclusionary zoning analysis for a single municipality
> by

August 15, 2013.  HUD then described five specific amendments
the County had to make to its zoning analysis of one of three
specified municipalities, if it wished HUD to stop moving
forward with the reallocation of the FY2011 CPD Funds.  HUD
again attached to its letter the Assurances and Strategy on
exclusionary zoning which it had previously provided to the
County.

The 2014 HUD Letter, dated July 18, is shorter.  It built
upon two prior letters from 2014.  On April 23, 2014, HUD
advised the County that the FY2011 CPD Funds had been
reallocated or expired, and that HUD intended to proceed with
reallocation of the FY2012 CPD Funds due to the County's
"steadfast[] refus[al] to revise its [AI] to include an adequate
analysis of restrictive zoning practices and a strategy to
overcome exclusionary zoning."  It noted that the Settlement

required the County to submit an AI "deemed acceptable by HUD."[24]
On June 27, HUD notified the County that it intended to reject
the County's Certification with its FY2014 Action Plan because
its AI remained inadequate.  In the wake of the County's refusal
respond to HUD's requests, the 2014 HUD Letter advised the
County that "HUD is rejecting the County' AFFH certification as
inaccurate and . . . is disapproving the County's FY 2014 Action
Plan as substantially incomplete . . . because the County has
failed to provide an adequate" AI and "and has given the
Department no assurance that it plans to come into compliance
with its AFFH obligations."  The 2014 HUD Letter again attached
the Assurances and Strategy.

### C. Review of HUD Decisions

There is no basis on this administrative record to find
that HUD has acted arbitrarily or capriciously.  Quite the
contrary.  HUD has acted with clarity and patience, repeatedly
explaining its grounds for rejecting inadequate AIs and offering
both guidance and assistance.  Over and over again, HUD has
given the County opportunities to amend its AIs, roadmaps to
assist it in doing so, and additional time to demonstrate a
willingness to comply with federal law.

---

[24] In its reply memorandum, the County for the first time cites
this letter as the "final rejection" of its FY2012-2013
Certifications.

Nor has HUD acted precipitously.  HUD's desire to give the CPD Funds to the County led it to design creative ways for the County to demonstrate a willingness to provide an adequate AI. HUD created a list of Assurances and a Strategy that, if adopted by the County, would cause HUD to suspend the reallocation process while the County revised its AI.  HUD's commitment to its mission and to the residents of Westchester County has so extended the time for the County to produce an acceptable AI that, when coupled with the County's litigation strategy, there is now a real risk that some CPD Funds will be lost to CPD programs altogether.  If the FY2013 CDBG and HOME Funds are not obligated to other jurisdictions by September 30, 2015, there is virtually no likelihood that those funds will ever be used as intended for housing and community development projects.[25]

Measured against the standards for assessing agency action, the record demonstrates that HUD has relied on factors that Congress intended it to consider, that it has not ignored any important aspect of the problem, that it has offered explanations for its decision grounded in the evidentiary record before the agency, and that its decision is a well-supported

---

[25] While the CPD Funds could, theoretically, still be given to the County if it submitted an adequate AI in the next five years, the County has been unwilling for the last six years to submit an adequate AI, and it has indicated that it no longer intends to seek CPD Funds.

product of its own expertise.  See, e.g., Nat. Res. Def. Council, 658 F.3d at 215.  It should now be beyond dispute that the Fair Housing Act, as well as the CDBG, HOME, and ESG statutes, require an applicant to analyze impediments erected by race discrimination and segregation to fair housing choice if it seeks to qualify for federal assistance under these programs. It is also well established that discriminatory zoning practices are an essential component of any such analysis.  See, e.g., Texas Dep't of Hous. & Cmty. Affairs, 2015 WL 2473449, at *17; Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 366 (2d Cir. 2003); LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995).  As the Supreme Court recently reminded us, the central purpose of the FHA is the eradication of discriminatory practices in housing.  Texas Dep't of Hous. & Cmty. Affairs, 2015 WL 2473449, at *17.  "These unlawful practices include zoning laws."  Id.

Moreover, the County does not point to any aspect of the problem that HUD has ignored and this Court's review of the record has uncovered none.  Finally, HUD's reason for rejecting the County's AI is firmly rooted in its expertise.

Not only are HUD's reasons for rejecting the County's AI firmly rooted in its expertise, they are not challenged by the County in this motion practice.  The County's bald assertions in its 2013 AI and AI Supplements that the zoning ordinances for

the municipalities it examined do not show a disparate or segregative impact on minorities and that they cannot be identified as impediments to fair housing are, as HUD pointed out, not supported by the data.  Indeed, HUD concluded they are at odds with the available data.  And at no point did the County undertake an adequate disparate impact analysis to support its counterintuitive and conclusory assertions.

When HUD rejected the County's AIs it was not, of course, writing on a clean slate.  For at least seven years preceding 2007, the County submitted false Certifications to HUD.  During the FCA litigation, the County adamantly argued that it was not required to consider race when analyzing impediments to fair housing choice.  Despite the requirement in the Settlement that the County promote source-of-income legislation, the County resisted that requirement for years and only complied after years of litigation.  Despite the requirement in the Settlement that the County produce an AI "acceptable" to HUD by December 2009, the County has never produced one acceptable to HUD.  It took until July 2010 to produce any post-Settlement AI, and only in 2013 did the County submit a substantially revised AI that incorporated data the Monitor had required the County to provide.

Against this long history of recalcitrance by the County, HUD has acted with great restraint and has labored, year after

year, to assist the County so that it could lawfully receive federal funds. There is, in short, no basis to find that HUD has acted arbitrarily or capriciously in issuing the 2013 or 2014 HUD Letters.

The County makes no serious attempt to refute HUD's substantive criticism of its AIs and Certifications. The County does argue, however, that HUD did not actually challenge the methodology or factual content of the County's analysis within its 2013 AI and AI Supplements since it only required the County to change the AI's conclusions. This is wrong. Conclusions are right or wrong because of how they are reached, and HUD consistently cited the County's failure to draw conclusions that were supported by the available data. HUD's critique of the 2013 AI went to the heart of the certification process and the law's requirement that a recipient of federal funds honestly and accurately certify that it would affirmatively further fair housing.

In short, the administrative record provides ample support for HUD's rejections of the County's AFFH Certifications and AIs. Those decisions were the product of expertise, experience, and reasonable judgment. They were not arbitrary and capricious.[26]

---

[26] In reaching this conclusion, the Court has not considered the Monitor's 2014 or 2015 Reports to be part of the administrative

**III. Sections 12711 and 12705(c)(1)**

As noted, the County does not assert that its conclusion in its 2013 AI and AI Supplements -- that the municipal zoning ordinances it examined do not show a disparate or segregative impact on minorities or serve as impediments to AFFH -- was supported by either its data or an adequate methodology. Instead, the County argues that HUD's decisions were based on factors that HUD is not statutorily permitted to consider.  In this way, the County contends, HUD "relied on factors which Congress had not intended it to consider," Bechtel, 710 F.3d at 446 (citation omitted), and acted "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C). The County relies exclusively on two of the statutory provisions underlying the HOME grant program -- §§ 12711 and 12705(c)(1) -- to support its contention.

According to the County, the two statutory provisions prohibit HUD from intruding in local public policy generally, and specifically in zoning practice.  The County argues that HUD therefore acted illegally by denying the County millions of dollars in CPD Funds when it demanded that the County (1) provide HUD with the Assurances listed in the 2013 HUD Letter, and (2) compel changes to local zoning ordinances.

---

record since they post-dated the HUD decisions challenged by the County in this litigation.

The County's argument fails for several reasons.  Most prominently, the County ignores that HUD rejected its AIs and Certifications because the AIs did not have an adequate analysis, and because this deficient analysis led the County to consistently draw conclusions that could not be supported by the County's own data.  The County also misconstrues the two provisions of the HOME statute.  Accordingly, the County's reliance on these two provisions fails to demonstrate the HUD acted beyond its authority in denying the County the CPD Funds.

**A. Section 12711**

The first statute on which the County relies is 42 U.S.C. § 12711.  The principles of statutory construction that will be applied here are well established.

"Statutory construction is a holistic endeavor," <u>Field Day, LLC v. County of Suffolk</u>, 463 F.3d 167, 177 (2d Cir. 2006) (citation omitted), and courts accordingly must "construe statutes, not isolated provisions." <u>King v. Burwell</u>, --- S. Ct. ---, 2015 WL 2473448, at *8 (U.S. June 25, 2015).  "In interpreting statutes, [a court] reads statutory language in light of the surrounding language and framework of the statute." <u>Field Day</u>, 463 F.3d at 177; <u>see also</u> <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997); <u>Cnty. of Nassau, N.Y. v. Leavitt</u>, 524 F.3d 408, 414 (2d Cir. 2008).

Section 12711 is a provision of the HOME program.  As described above, the purposes of the HOME program include "improv[ing] housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis."  42 U.S.C. § 12702(3). Eligibility for the HOME program hinges on submission of "a comprehensive housing affordability strategy" in accordance with 42 U.S.C. § 12705, which includes an AFFH certification requirement.  Id. § 12705(b)(15).  As the Court of Appeals explained, however, there are limitations on HUD's authority to approve or reject a jurisdiction's application for grant funding.  2015 Opinion, 778 F.3d at 420.

Section 12711, entitled "Protection of State and local authority", in particular restricts HUD's decision-making.  It states that:

> Notwithstanding any other provision of this subchapter or subchapter II of this chapter,[27] the Secretary shall not establish any criteria for allocating or denying funds made available under programs administered by the Secretary based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law that is . . . not in violation of any Federal law.

---

[27] The first clause of § 12711 refers to "this subchapter" and to "subchapter II of this chapter."  The subchapter in which § 12711 appears contains the general requirements for approval of grants under the HOME program.  42 U.S.C. §§ 12705–12714. Subchapter II of the statute in which § 12711 appears contains provisions relating to other affordable housing programs and model programs that are not at issue here.  Id. §§ 12721–12740.

42 U.S.C. § 12711 (emphasis added).  The parties agree that a
zoning ordinance is a jurisdiction's "public policy, regulation,
or law."  Id.

The County appears to argue that HUD violated § 12711 in
making two separate categories of demands on the County in the
HUD 2013 Letter of August 9.  First, it argues that HUD violated
this statute when it demanded that the County change its
conclusions in its AI Supplements about the exclusionary impact
of municipal ordinances.  Second, it argues that HUD violated
this statute when it demanded that the County identify in its AI
the steps it will take to cause municipalities to change their
exclusionary zoning regulations, including the circumstances
that would prompt the County to take legal action to effect such
change.

As described above, in its 2013 Letter HUD reviewed the
County's AI Supplements, found them wanting, and notified the
County that, absent a satisfactory response by August 15, 2013,
it would move forward with the process of reallocating FY2011
CPD Funds.  Each of the two arguments the County makes about the
ways in which this letter violated the law will be examined in
turn.

### 1. Changing Conclusions in AI Supplement

The County first argues that HUD's demand that it change its conclusion about the exclusionary impact of zoning ordinances violated § 12711.  To place this argument in context, it is necessary to examine precisely what the County said in its AI Supplement, and HUD's statements in the 2013 Letter.

In its AI Supplement, the County concluded for each and every municipality that its "zoning ordinance . . . does not have a disparate impact on minorities" and that the "six restrictive practices do not have a disparate impact on minorities."  Each analysis ended with this statement: "Therefore, the County has concluded that [the municipality's] zoning ordinance does not show a separate or segregative impact on minorities and does not pose an impediment to AFFH with respect to race."

In the August 9 letter, HUD stated:

> While progress has been made, the County continues to assert that local zoning ordinances do not have a disparate impact on minorities and that the County "has concluded that [the municipality's] zoning ordinance does not show a disparate or segregative impact on minorities and does not include provisions that can be identified as impediments to AFFH with respect to race or ethnicity."  These conclusions are simply not supported by the available data and do not reflect an adequate disparate impact analysis.  As the County itself acknowledges, Restrictive Practices exist in these municipalities that have the effect of limiting the availability of affordable housing.  Such limitations may in fact have an exclusionary effect based on race, national origin, or familial status,

which the data supports.  The refusal to acknowledge
any connection between zoning restrictions that affect
the availability and location of affordable housing
and fair housing protections directly challenges the
Court's rulings on the matter and the Settlement
itself.  <u>HUD therefore cannot accept the County's
Zoning Submission.  Thus, the County's AI remains
unacceptable.</u>

(Emphasis added.)

Because "[t]ime is of the essence due to the reallocation

process," HUD required the County to "demonstrate that it can

complete an amended exclusionary zoning analysis" for at least

one of three selected municipalities by August 15.  HUD

identified five required amendments.  Two of them appear to be

of particular importance to the County's argument.

The third identified amendment required the County to

"<u>Strike unsupported conclusions</u> that the identified Restrictive

Practices in the subject municipality do not have a disparate

impact or segregative impact based on race or national origin."

(Emphasis added.)  The fourth required that the County

<u>State that the existence of each Restrictive Practice
may have the effect of excluding</u> potential residents
of the subject municipality based on race, national
origin, and in the case of restrictions on the number
of bedrooms in a unit, based on familial status (the
presence of children under the age of 18).  Where
Restrictive Practices have the potential effect of
reducing the availability of affordable housing
opportunities in a community with relatively low
populations of Black and Hispanic households, and
where demographically Black and Hispanic Households
have greater affordable housing needs, the County must
<u>acknowledge that such practices are potentially
discriminatory</u> based on race, national origin and,

74

therefore, are a cause for concern.  Where a
Restrictive Practice may have the effect of reducing
the availability and affordability of housing suitable
for families with children, the County must similarly
acknowledge such practice is potentially
discriminatory on the basis of familial status.

(Emphasis added.)

The County has failed to show that these demands for
amendments to the AI violated § 112711.  None of the required
amendments denies HOME Funds to the County based on the
"adoption, continuation or discontinuation" by any municipality
of its zoning ordinance.  See 42 U.S.C. § 12711.  These demands
do not hinge on whether a municipality changes its zoning
ordinance or not.  What the demands do hinge on is the integrity
of the County's Certification that it would AFFH.  HUD required
the County to strike "unsupported" conclusions, "acknowledge"
that practices are "potentially" discriminatory, and "state"
that certain practices "may" have exclusionary effects.

Moreover, all of these amendment demands are made against a
backdrop of the County's assertion in its AI Supplement that
there was no disparate impact from municipal zoning ordinances.
HUD determined that assertion to be at odds with the available
data and unsupported by any adequate analysis.  Challenges to
zoning practices "reside at the heartland of disparate-impact
[fair housing] liability."  Texas Dep't of Hous. & Cmty.
Affairs, 2015 WL 2473449, at *17.  It would run counter to the

75

purposes of the HOME statute to force HUD to accept just any analysis of impediments to fair housing, including zoning ordinances, no matter how unreliable, unsupported, methodologically unsound, or poorly reasoned.  To construe § 12711 this way would gut the AFFH certification requirement. The HOME statute itself requires that a certification be accurate and be based on "supporting evidence."  42 U.S.C. § 12704(21).  After all, the furthering of fair housing begins with and depends upon an accurate assessment of any impediments to fair housing choice.

### 2. Efforts to Change Zoning Ordinances

The County argues that HUD also violated § 12711 when it required the County to identify the steps it would take to cause municipalities to change their zoning ordinances.  This argument also fails.

In its 2013 Letter, HUD required the County to demonstrate that it could produce an acceptable AI not only by amending its zoning analysis for a single selected municipality by August 15, but also by providing four Assurances by that date.  The County's argument that HUD's demand for such an assurance violated the law appears to rest on the second requested Assurance.

The second Assurance asks the County to state, in pertinent part, that the County "adopts and incorporates into its [AI] the

findings of the [Monitor's 2013 Report] and will comply with his recommendations."  As identified by the County,[28] the Monitor's recommendations that are at issue here relate, in essence, to two requests for information.  The first requests the County to identify the steps it will take to cause municipalities to change exclusionary zoning ordinances.[29]  The second requests the County to identify circumstances under which the County would take legal action to challenge zoning.[30]  At bottom, therefore, HUD's request for this Assurance required the County, if it wished to demonstrate an ability to produce an acceptable AI and delay the reallocation of FY2011 Funds, to make a disclosure to HUD of the steps it would take to change exclusionary municipal ordinances.

   Before addressing whether HUD's demand for this Assurance violates § 12711, two observations are in order.  First, the

---

[28] The County's memorandum in support of its motion for summary judgment identifies pages 23 to 24 and page 52 of the Monitor's 2013 Report as the passages containing the directives allegedly violative of § 12711.

[29] For example, the Monitor directed the County "to identify the steps it will take to ensure that the municipalities make provision for affordable housing, including, but not limited to, modification of certain zoning regulations."

[30] For example, the Monitor -- citing the Settlement and the Magistrate Judge's 2012 Opinion -- noted that the County is required to take steps to ensure its efforts to address the need for affordable housing are not impeded, which "may take" the form of "taking legal action" against municipalities.

County's failure to provide the requested Assurance was not the reason HUD denied HOME Funds to the County.  HUD denied HOME funds to the County because it failed to file an AI acceptable to HUD.  HUD's request for Assurances was made in the context of a failed AI process, and the imminent reallocation of FY2011 CPD Funds.

The second, and related, point is that HUD could not lawfully distribute CPD Funds to the County, under the Home program or the CDBG program, without a Certification by the County that it would AFFH, supported by an adequate AI.  And, there is no showing that the County ever submitted such a Certification to HUD.  The very first requirement for an accurate and acceptable AI is for the County to conduct an analysis of any impediments to fair housing choice within the County.  See 24 C.F.R. § 91.225(a)(1).  Section 12711 does not abrogate the duty of an applicant to file an honest, complete, and acceptable Housing Strategy, including an accurate Certification that a jurisdiction will AFFH.  As already explained, there is no evidence in this administrative record that the County complied with this threshold requirement for receiving federal housing and community development funds.  Therefore, the County has not demonstrated an entitlement to federal funds, wholly apart from any demand made by HUD that the

County identify the steps it would take to combat exclusionary zoning ordinances.

Because of the foregoing, it is not even necessary to determine whether HUD's request for an Assurance violated § 12711.  Put simply, even if it did, the County would not be entitled to the HOME Funds.  But, HUD's request for the Assurance did not violate § 12711.

HUD's demand that the County identify steps it would take to cause a municipality to change an exclusionary zoning ordinance did not condition HOME funding on the "adoption, continuation, or discontinuation" of any jurisdiction's zoning ordinance.[31]  42 U.S.C. § 12711.  Whether a jurisdiction continued to have, in HUD's view, an exclusionary zoning ordinance did not prevent the County from receiving HOME Funds.

HUD's demand for the Assurance from the County appears to arise from both the requirement that a recipient of CPD Funds take appropriate actions to overcome the effects of any impediment to fair housing that its analysis of impediments has identified, see 24 C.F.R. § 91.225(a)(1), and from the County's recalcitrance in submitting an acceptable AI, despite the commitments it made in the Settlement and the assistance given

---

[31] Of course, the County does not have the power to write zoning ordinances, which are controlled by local zoning boards.

to it by the Monitor.  HUD's demand was made against the backdrop of years of delay and the statutory deadlines inherent in the reallocation process.  As HUD explained in its 2013 Letter, if it were to delay reallocation further, and thereby risk losing the opportunity to give the Funds to qualifying jurisdictions, it needed Assurances that the County could submit an acceptable AI.  HUD did not demand that any zoning ordinance actually be changed.

It is noteworthy that the Assurance required by HUD asked for little more than the County had already committed to give in the Settlement.  In the Settlement, the County agreed to submit an AI acceptable to HUD that, <u>inter alia</u>, identified "the appropriate actions the County will take to address and overcome the effects" of identified impediments to fair housing.[32]  It also agreed, in the context of the 750 units it was required to build, to pursue legal actions against municipalities if they were necessary.  In sum, the County has shown no right to HOME Funds due to any alleged violation by HUD of § 12711.

---

[32] HUD argues that the County's actions place it squarely within the exception in § 12711 for public policies that are "in violation of any Federal law," and that the County's Certifications that it would AFFH are such violations.  HUD argues as well that the exception for violations of federal law applies because there is <u>prima facie</u> evidence of exclusionary zoning in several municipalities.  This Opinion declines to reach either of those issues.

**B.   Section 12705**

The second statutory provision upon which the County relies is § 12705 of the HOME program.  The County presents two arguments here as well.  The County relies first on an exclusion within § 12705 related to consideration of issues of affordable housing.  It also asserts that HUD was required to approve the County's Housing Strategy since it was "substantially complete", as required by this statute.  These arguments will be addressed in turn.  Neither succeeds in rendering HUD's denial of HOME funds contrary to law.

**1.   Subsection (c)(1)**

Subsection (c)(1) of § 12705 requires the Secretary to approve an applicant's "housing strategy" unless it is inconsistent with the purposes of the HOME statute or not "substantially complete", with one exception.  Subsection 12705(c)(1) adds that "the adoption or continuation of a public policy identified pursuant to subsection (b)(4) of this section shall not be a basis for the Secretary's disapproval of a housing strategy."  42 U.S.C. § 12705(c)(1).

Subsection (b) lists twenty different components of a housing strategy.  One of those components is the certification that the jurisdiction will affirmatively further fair housing. Id. at (b)(15).  Section 12705(b)(4), which the Secretary may

not use as a basis for disapproving a housing strategy, requires a grantee to

> explain whether the cost of housing or the incentives to develop, maintain, or improve affordable housing in the jurisdiction are affected by public policies, particularly by policies of the jurisdiction, including tax policies affecting land and other property, land use controls, zoning ordinances, building codes, fees and charges, growth limits, and policies that affect the return on residential investment, and describe the jurisdiction's strategy to remove or ameliorate negative effects, if any, of such policies.

Id. § 12705(b)(4) (emphasis added).

The legislative history of § 12705(c)(1) reveals that it was intended to limit HUD's fund-conditioning authority with respect to "affordability" policies, not "fair housing" ones. The Senate Report explained that

> The intent of the Committee bill is to give state and local governments more effective tools for achieving housing affordability -- not to give HUD new authority to intervene in state and local decision-making.  That is why the Committee bill does not permit HUD to disapprove a housing strategy because of HUD's disagreement with any policies identified under section 105(b)(4) . . . .

S. Rep. No. 101-316, at 40 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5806 (emphasis added).  The Report gives "rent control or stabilization" as an example of its concern over "controversial policies."  Id.  By contrast, the Senate Report describes in broad terms the independent obligation of a jurisdiction to AFFH and the legislative intent to require

jurisdictions to "affirmatively carry out activities that reduce or eliminate discriminatory impact in housing on the basis of race, creed, national origin, gender or disability." Id. at 5807.

Thus, the direction to the Secretary in § 12705 on which the County relies is irrelevant to the Secretary's exercise of his discretion here.  Subsection (b)(4) relates to issues of affordable housing.  As this Court has observed, fair housing and affordable housing are readily distinguishable in this context.  See 2009 Opinion, 668 F. Supp. 2d at 562 ("A review of the 2000 and 2004 AIs demonstrates that they were conducted through the lens of affordable housing, rather than fair housing and its focus on protected classes such as race.").  HUD's denial was based on issues related to fair housing -- in particular, the County's conclusory and unsupported assertion that zoning ordinances did not have a disparate impact on minorities.  Because HUD did not deny the County's application because of a failure to explain the impact of local zoning on the cost of housing, HUD did not violate §§ 12705(c)(1) and (b)(4).

### 2. "Substantially Complete"

The County advances one final argument.  It argues that its AI was "substantially complete" and that that was all that was required for its approval under the HOME statute.

Under the HOME statute, HUD must approve an otherwise
acceptable Housing Strategy within 60 days of receipt so long as
it is "substantially complete."  Section 12705 states that

> The Secretary shall review the housing strategy upon
> receipt.  Not later than 60 days after receipt by the
> Secretary, the housing strategy shall be approved
> unless the Secretary determines before that date that
> (A) the housing strategy is inconsistent with the
> purposes of this Act, or (B) the information described
> in subsection (b) of this section has not been
> provided in a substantially complete manner.

42 U.S.C § 12705(c)(1) (emphasis added).  The corresponding
regulations permit HUD to "disapprove a plan or a portion of a
plan if it is . . . substantially incomplete," and provide as an
example of such a plan one "for which a certification is
rejected by HUD as inaccurate, after HUD has inspected the
evidence and provided due notice and opportunity to the
jurisdiction for comment."  24 C.F.R. § 91.500(b).

As described earlier in this Opinion, HUD repeatedly
advised the County that it was rejecting its Certifications.  It
gave the County notice of its intent to do so and an opportunity
to be heard and to cure identified defects in the AIs.  It
thoroughly examined the County's submissions and the available
evidence before taking those steps.  This was a sufficient basis
for HUD's conclusion that the County's Housing Strategy was not
substantially complete, and HUD regularly informed the County
that it had reached that conclusion.

According to the County, HUD acknowledged that its Housing Strategy contained all twenty of the requirements for HOME fund eligibility.  The County points out that an acceptable AI was only one of many statutory components of a Housing Strategy, and notes that its AI included an analysis of impediments and actions it would take to address those impediments.

The County's argument fails.  It was not a violation of § 12705(c)(1) or an abuse of its discretion for HUD to determine (as it repeatedly advised the County that it had) that the County's Housing Strategy was not substantially complete.  HUD regulations provide that the inaccuracy of a Certification is grounds for finding a Housing Strategy "substantially incomplete."  See 24 C.F.R. § 91.500(b).  As already discussed, HUD acted well within its discretion in determining that the County's AI was inadequate and its AFFH Certification was therefore inaccurate.  Accordingly, neither of the HOME statute's provisions on which the County relies provides a basis for denying HUD's motion for summary judgment.

## C. Application of § 12705 and § 12711 to CDBG and ESG Grants

Sections 12705(c)(1) and 12711 appear in the provisions governing the HOME program.  HUD sensibly argues that, even if these provisions impose limitations on HUD's discretion with respect to the HOME program, they do not apply to the CDBG and

ESG programs because those programs are administered pursuant to different statutes.  HUD is correct.

The County offers few arguments on this point.  Its position is that, because AFFH Certifications are required for all three CPD programs and those programs are applied for in the same Consolidated Plan, the regulations defining AFFH Certification absorb the protections of §§ 12705(c) and 12711.  According to the County, imposing different standards on different programs would be "absurd" and Congress's locality-protective purpose in passing the HOME statute simply must be shared by the CDBG statute.

But, any limitations imposed on HUD's discretion to approve or deny a Housing Strategy do not limit HUD's discretion to reject AFFH Certifications under the CDBG or ESG programs.  Indeed, there is a separate AFFH certification requirement in the CDBG statute, 42 U.S.C. § 5301(b)(2), from the certification requirement in the HOME statute, id. § 91.225(a)(1).  Put another way, it is unremarkable that Congress imposed certain limits on HUD's discretion with respect to HOME funds but not CDBG or ESG funds.

Sections 12705(c) and 12711 of the HOME program, therefore, apply to the HOME program alone.  As a consequence, the County has presented virtually no challenge to HUD's decision under the CDBG and ESG programs.  For the reasons described above, the

County's only substantive arguments rest on the two provisions of the HOME statute and neither provision applies here.

## IV. The Settlement

Having determined that HUD acted within its discretion and lawfully when it denied CPD Funds to the County, it is unnecessary to determine whether HUD was also entitled to withhold CPD Funds from the County because the County violated the Settlement.

### CONCLUSION

The defendants' April 17 motion for summary judgment is granted and the County's May 1 cross-motion is denied.  The Clerk of Court shall enter judgment accordingly and close each of these cases.

Dated:    New York, New York
          July 17, 2015

                    _____
                         DENISE COTE
              United States District Judge